# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RICHARD SNOWDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  08-3051 |
| | ) | |
| CAROL ADAMS, GRACE HOU, | ) | |
| ROBERT KILBURY, KRIS SMITH, | ) | |
| MARJORIE OLSON, and | ) | |
| JANE BREEN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S  District Judge.

This cause is before the Court on the Motion for Summary Judgment (d/e 29) filed by Defendants Carol Adams, Grace Hou, Robert Kilbury, Kris Smith, Marjorie Olson, and Jane Breen.  For the reasons that follow, the Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  Summary judgment is granted in favor of Defendants Hou, Kilbury, Smith, Olson, and Breen. Summary judgment is denied as to Defendant Adams.

# I.  FACTS

In April 2005, Plaintiff Richard Snowden was hired as the Superintendent of the Illinois School for the Visually Impaired (ISVI), a facility operated by the Division of Rehabilitation Services (Division) of the Illinois Department of Human Services (Department).  According to Plaintiff, a campaign was launched in 2006 to have Plaintiff  removed as Superintendent.  Plaintiff asserts that first his credentials were attacked and then a letter-writing campaign was commenced.  On November 7, 2006, Plaintiff was removed as Superintendent and assigned to the Forensic Unit of the Department's Division of Mental Health.

Plaintiff filed a six-count Amended Complaint, pursuant to 42 U.S.C. § 1983, against the individuals Plaintiff believed violated his constitutional right to liberty of occupation: (1) Carol Adams, the Secretary of the Department; (2) Grace Hou, Assistant Secretary of the Department; (3) Robert Kilbury, Director of the Division; (4) Kris Smith, Division employee; (5) Marjorie Olson, Educational Liaison to ISVI for the Division; and (6) Jane Breen, Director of Support Services at ISVI.

Each Defendant was sued in his or her individual capacity and, for purposes of implementing equitable relief, his or her official capacity.

The facts are largely undisputed, although the parties dispute the materiality of many of the facts. The following facts are taken from the parties' Statement of Undisputed Facts, Additional Statement of Undisputed Facts, and the attachments thereto.

A.      Evidence Pertaining to Plaintiff's Qualifications

Evidence pertaining to Plaintiff's qualifications is relevant only to the extent that Plaintiff's lack of a superintendent endorsement appears to have precipitated the calls for Plaintiff's removal as Superintendent.

Defendant Olson was in charge of the search committee that recommended Plaintiff be hired. Despite Plaintiff disclosing on his application that he did not hold a public school superintendent certification (hereinafter, superintendent endorsement), Olson claimed she did not know this until November 2005 when she contacted Plaintiff for information regarding another position. In March 2006, Olson forwarded information regarding Plaintiff's lack of superintendent

endorsement to Defendant Smith who was at that time Plaintiff's supervisor.

In addition, a document describing Plaintiff's credentials as an educator, including his certifications, was left in a brown envelope at the home of Jane Dickison, a 1973 graduate of ISVI and member of the ISVI alumni association. No date is given for when this occurred. Dickison did not know who left the documents at her home but did not think a student would have access to the information contained in the brown envelope.

In September 2006, Dickison, on behalf of the Alumni Association, forwarded the documents she received in the brown envelope to Defendant Adams. Dickison and Joe Lanier, the chairman of the board of directors of the Alumni Association, thought Plaintiff should be removed as Superintendent because they believed Plaintiff was unqualified to be Superintendent.

B.      Complaints Made About Plaintiff

During 2006, individuals in the Department, the Governor's office,

and the Alumni Association began receiving complaints alleging misconduct by Plaintiff and raising concerns about Plaintiff's management of various programs at ISVI. The parties dispute whether Plaintiff was asked to respond in writing to some of these complaints. Plaintiff asserts that although Defendant Kilbury informed Plaintiff on September 26, 2006, that the Department had received numerous complaints, Kilbury refused to provide Plaintiff with the source and nature of the complaints.

In addition to the anonymous correspondence complaining about Plaintiff–which is discussed in more detail below–the record shows that additional nonanonymous complaints were made about Plaintiff. For example, on September 27, 2006, Defendants Adams and Kilbury received an email accusing Plaintiff of promoting an atmosphere of distrust, attempting to set up a spy network among students and staff, verbally threatening students, and failing to have proper credentials for his position. The name of the individual sending the email is redacted on the copy in the record.

In addition, Defendant Olson testified that she received complaints about Plaintiff from staff and alumni. Dickison, who had received complaints from parents, students, and staff about both the school's independent living center and Plaintiff, relayed the information to Defendant Olson. Lanier also testified he was contacted by alumni and students with complaints.

The following additional complaints were made about Plaintiff. These letters appear to be the basis for Plaintiff's claims.

1. <u>March 2006 Pamphlet</u>

On March 22, 2006, Congressman Ray LaHood visited the ISVI campus. Two recent graduates of ISVI conducted a protest against Plaintiff, carrying picket signs and passing out a pamphlet critical of Plaintiff. Defendants Olson and Kilbury knew protesters would be there that day but did not tell Plaintiff.

The pamphlet distributed by the two students contained complaints about certain actions taken by Plaintiff, including the demotion of a grant writer, appointment of individuals to positions for

which they were not qualified, and the filling of positions with Plaintiff's friends. The pamphlet stated, "Rumor has it that the Superintendent even withheld the filling of one position because the top ranked candidate wasn't a Democrat."

The pamphlet also mentioned that Plaintiff did not have his superintendent's endorsement. Finally, the pamphlet questioned why money was not being spent on up-to-date textbooks, additional servers, an accessible Teen Center, games in the basement, and a new projector and movie screen.

Olson was with Plaintiff during part of LaHood's visit. A newspaper reporter told Plaintiff, in Defendant Olson's presence, that he was going to print an article based on the information in the pamphlet but would give Plaintiff the opportunity to speak with him. Plaintiff told Olson he was going to speak to the reporter, although Olson had instructed him not to make any comments to the press. As Plaintiff and Olson approached the reporter, Olson stated, "Let's see you get your ass out of this one."

According to Plaintiff, Defendant Breen later told Plaintiff that Olson visited Breen in the hospital the afternoon of LaHood's visit. Breen purportedly told Plaintiff that when Olson entered the room, Olson was waving the pamphlet and saying, "[W]e got him, we got him."

2. <u>Anonymous Undated Letter to a Parent</u>

An undated letter, purportedly sent anonymously by a parent of an ISVI student, was sent to "Mr. Zabelski," another parent of an ISVI student. In the letter, the author notes recent allegations that Plaintiff lacked a superintendent endorsement. The author also noted that, in speaking with ISVI staff and Department personnel, they seemed to fear Plaintiff's political connections and "supposed vindictive nature toward staff or non-democrats." The author asked that the matter of Plaintiff's lack of credentials be investigated.

3. <u>April 21, 2006 Anonymous Letter</u>

On April 21, 2006, the Governor's Office received an anonymous letter reflecting that the letter was also sent to Defendant Adams, Judy Barr Topinka, and the Chicago and Springfield newspapers. The letter

read:

> Superintendent Richard Snowden–UnEthical
> hiring practices
>
> 1. Review job posting (Enclosed)
>
> 2. Note highlighted area.
>
> 3. Richard Snowden does not possess a
> Superintendents Endorsement nor is he
> attempting to obtain one.
>
> 4. Note: Previous Superintendent, Carrol Jackson
> did not possess certification. According to Carrol
> Jackson, his failure to obtain certification resulted
> DHS requested his resignation.
>
> This is an ethical violation in hiring practices. I
> think the Governor and DHS needs to respond."

4. <u>September 18, 2006, Anonymous Letter</u>

On September 18, 2006, the Rehabilitation Services Department,

Associate Director's Office, received an anonymous letter written to

"whomever is willing to listen to the truth." The letter purports to have

been written by students of the ISVI. In the letter, the author complains

of changes to the independent living program and the lack of a recreation

program. In addition, the letter states:

Our Superintendent asks students things about what staff are doing and pits students against student as well as staff against staff.

The environment is very uncomfortable for everyone.  Everyone is afraid of each other even among us students.  We are afraid of who will report who first.

This is the dirtiest way to play and is much like what happens on the streets.

5.  September 21, 2006  Letter

On September 25, 2006, the Governor's office received a letter dated September 21, 2006 from "The Students of Illinois School for the Visually Impaired."  In the letter, the author complains about changes to the Transitional Living Program and Transitional Learning Center.  The letter states,

"All of the changes are enforced by our superintendent, Richard Snowden.  It appears to us he is taking the [Transitional Living Center], a good program and shredding it to pieces.  When we called our parents and expressed our frustration to them, he bought some chicken and pizza which seem to be a bribe. . . .  We are sick and tired of bribes and prevarications. . . .  We believe he is an extremely unethical individual who would do anything to get his way.  We are afraid to state our

opinions for fear of being ignored and campus
morale is very low.  Students and staff alike are
being bullied by kids and it appears that the
superintendent does nothing to stop it or picks
and chooses who should be punished and what is
the punishment.  . . . It seems as if our parents are
being lied to about the things that are happening
at this school and a pretty yet deceitful picture is
being painted and displayed to the public.  We are
tired of the unfair actions and would like nothing
more than for someone to take action.

6.  September 26, 2006 "Politics" Letter

On September 26, 2006, Defendant Olson found a letter on the

chair in her office.  Defendant Olson's office was located in the Hay

Edwards building in Springfield.  According to Defendant Kilbury, no

ISVI student or staff member would have access to her office.  Security in

the building requires that visitors sign in and out to gain access.

The letter, titled "Politics" was signed "ISVI Staff and Students."

The letter provided:

We, the staff at ISVI, find it odd that DHS refuses
to deal with an individual (Richard Snowden)
whom has committed more infractions than a
human rights organization can shake a stick at . . .
. Unprofessional . . . .bully . . . intimidator . . . .
unethical . .  are a few of the terms utilized to

describe this individual.

Everyone is so angry at the politics of the situation.  However, we have to ask Secretary Adams, Robert Kilbury and others, [i]s it politics that keep you from acting on what you know is the right thing to do?  Well, we here at ISVI feel your pain.  We too stand to loose our jobs.  We fear the Governor['s] office and Senator Deanna Demuzio.  We question the integrity of the entire situation due to the fact that "Dr." Snowden is considered small in terms of what truly is considered a man.  Our question is one of judgement in terms of the individuals we have elected into office, we have truly made the wrong choice in voting for the Governor and Deanna Demuzio.

Each can count on (as of today) 60 or more less votes from ISVI staff during this next election.  Staff that have retired or preparing to retire will unite to be advocates to spread the word about corruption and human rights issues here at ISVI.

7.  <u>October 25, 2006, Letter</u>

On October 25, 2006, Plaintiff was provided with a letter that had been located in a student's room.  In his deposition, Plaintiff testified a stack of letters was found in the student's room.  It is not clear from the record whether the letter dated October 25, 2006, was the letter found in

a student's room.

The October 25, 2006, letter was sent to parents of ISVI students from "A Group of concerned Students, Illinois School for the visually impaired."  The letter attempted to refute information provided by Plaintiff in a September 28, 2006, letter regarding improvements made at ISVI.  The letter provides:

> After careful analysis and scrutiny of this letter, by a group of students, it was concluded with solid evidence that Dr. Snowden's letter is full of deception and half-truths.

The letter complains about the Bureau of Civil Affairs (BCA) investigation, which will be discussed further below.  The letter notes:

> As you can plainly see, the 'investigation' was nothing short of an illusion to act as if something had been done about the situation.  We tend to believe that it was all set up by DHS due to the contents in this paragraph.  As of the writing of this letter, we have not heard any results from the investigation.

In the letter, the author complains about the recreation center being run by sighted individuals with blind individuals being "used as puppets" to give the impression that they are running the program.  The author

states:

> Students are afraid of the consequences of what
> could happen if the superintendent stays in power.
> The campus morale is gone.  There have been
> people trying to intimidate others with obscene
> comments and possible threats of termination.
> Students have been bribed into not telling their
> parents of the immoral events that have taken
> place.  We tend to believe that the Governor of
> Illinois is aware of the situation but refuses to do
> anything. After all, wasn't the superintendent
> appointed by the governor?

Finally, the letter states: "The superintendent pretends to listen to students but we know that it falls on deaf ears."

C.     Evidence Regarding the Ability of the ISVI Students to Write the Anonymous Letters

Cindy Miller, an ISVI educator, did not believe a student would have been capable of writing the October 25, 2006 letter or the March 2006 pamphlet.  Similarly, Paul Drake, the individual in charge of employment programs for ISVI students and the Transitional Living Center, testified that he reviewed the letters written about Plaintiff and did not believe an ISVI student would have been capable of writing them.

Drake and Tanella Pool, a social worker at ISVI, testified the letter

entitled "Politics," which purported to have been written by ISVI staff and students, did not reflect their views.

D.    Investigation of Plaintiff by the Bureau of Civil Affairs

In September 2006, Defendant Hou asked the BCA to look into the allegations of improper conduct by Plaintiff. The BCA report was not completed until December 2006, a month after Plaintiff was removed from the Superintendent's position.

The BCA report concluded that "insufficient evidence exists to corroborate the specific allegations of harassment, threat of harm, bullying, intimidation and threats of intimidation" by Plaintiff. The BCA found that the majority of staff and advisory board members approved of the changes made under Plaintiff's direction. The BCA also determined, however, that Plaintiff's "management style might be perceived negatively." And while the majority of students interviewed had no complaints of personal encounters with Plaintiff, they did "express their dissatisfaction with the way he has implemented changes to the Transitional Living Program and Transitional Living Center." In

addition, "[a] small number of staff and students also expressed fear of reprisal from [Plaintiff] for their opposition to various programmatic changes."

E.     Plaintiff's Removal from the Superintendent Position

On November 6, 2006, Defendant Kilbury told Plaintiff he was being transferred to the Department's Division of Forensic Services in Springfield, Illinois. Kilbury directed Plaintiff to report to Forensic Services on November 8, 2006.

Plaintiff reported to the Forensic Unit for 8 and 10 days. Plaintiff was given no work and had no office. He discovered there was no job description for his position and the Division did not have funds budgeted to pay his salary.

Plaintiff began to have trouble sleeping and had difficulty concentrating. Plaintiff began to use sick time. Plaintiff was diagnosed with severe depression and anxiety disorder and took a medical leave of absence from his job. In 2007, Plaintiff retired from state government.

F.     The Newspaper Articles

After Plaintiff's removal from the Superintendent position, two newspaper articles were published in the local newspapers discussing Plaintiff's transfer and the future of ISVI. Tom Green, the spokesperson for DHS, provided comments on behalf of the Department for these articles. Green testified he did not specifically remember who gave him direction about how to respond to the media on these particular occasions but that it would likely have been Defendant Kilbury, Defendant Adams, and/or Teyonda Wertz, the chief of staff.

The first newspaper article, dated November 10, 2006, was entitled "News of Richard Snowden's departure met with relief by many staff, students at school for blind." The article noted Plaintiff's transfer, and stated, in part, as follows:

> Mr. Green said he did not have a statement on why the change was made. He said there is no timetable set for finding a successor at ISVI, and said it was more than likely Mrs. Forney would finish the year.
>
> Dr. Snowden was unpopular with many students, staff and alumni, who believed he was not qualified for the position.

"I think it's wonderful, and I'm going to communicate to anybody who will listen to me that the alumni association will help out in any capacity possible" said Joe Lanier, president of the ISVI Alumni Association.

* * *

Dr. Snowden's decisions regarding the school's independent living center where students learned practical skills such as cooking, shopping and balancing check books were also questioned. Alumni and students believed he was not properly allocated staff to the facility.

The second newspaper article, which was undated in the record,

provided, in part, as follows:

Richard Snowden was notified Wednesday that he would be moved to the Department of Human Services Division of Mental Health Forensic Unit, which oversees mental health patients sent there by court order, according to DHS spokesman Tom Green.

* * *

Green said he could not comment on the reasons behind the transfer, saying only "it was a management decision. It (the move) may have appeared to be sudden, but DHS did have reasons that led up to it, and it wasn't sudden. I can't go into any other details."

G.     Senator Demuzio's Affidavit

In November or December 2006, Senator Demuzio contacted

Defendant Adams to find out why Plaintiff had been removed from ISVI.

According to Senator Demuzio's affidavit, Adams:

> indicated that there were many things which had
> occurred giving rise to his removal and they were
> just too bad to talk about.  She asked me to trust
> her on that point.  I came away from that
> conversation with the impression that [Plaintiff]
> had engaged in very serious misconduct which led
> to his removal.

H.     Plaintiff's Attempts to Find Employment

After retiring in 2007, Plaintiff inquired about employment

opportunities with Steven Breese, regional superintendent of schools.

Plaintiff testified that Breese told Plaintiff his employment prospects

were not good because of the "news article and the way I left the school,

the circumstances around the way I left the school."

Plaintiff also inquired about employment opportunities with Tom

Zaborac, director of the Spoon River Adult Education program, and John

Marshall, superintendent for Vermont, Ipava, and Table Grove.  Plaintiff

provided them with the Jacksonville newspaper article and showed Marshall "[his] allegations." Both Zaborac and Marshall told Plaintiff to clear up the allegations against him.

In his Affidavit, Plaintiff stated he also spoke to Senator Demuzio about employment in an educational capacity in state government. Plaintiff stated in his Affidavit that each of the individuals he spoke to about employment was aware that Plaintiff had been removed from his position as Superintendent. Plaintiff also stated each of the individuals he spoke to told him to "clear up the situation at ISVI" before applying for a position at their particular institution.

Plaintiff also sought the opinion of a consultant named Glen Crawford. Plaintiff provided Crawford with the newspaper articles. According to Plaintiff, Crawford told Plaintiff his "'chances would not be good' due to the investigation and newspaper articles." Defendant Kilbury also testified that he would not hire a superintendent who allegedly threatened and intimidated students, threatened staff, or made decisions based on partisan politics.

Defendants now move for Summary Judgment.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction because Plaintiff asserted claims based on federal law.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").  Venue is proper because the events giving rise to the claim occurred in Morgan County, Illinois.  See 28 U.S.C. § 1391(b) (a civil action where jurisdiction is not founded solely on diversity of citizenship may be brought in a judicial district where a substantial part of the events or omissions giving rise to the claim occurred).

## III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also,

Fed.R.Civ.P. 56(c).  A moving party must show that no reasonable fact-finder could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997).

The movant bears the burden of establishing that there is no genuine issue of material fact.  Celotex Corp, 477 U.S. at 323.  If the movant meets this burden, the non-movant must set forth specific facts demonstrating that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Anderson, 477 U.S. at 252.

In deciding a motion for summary judgment, a court can only consider sworn statements based on personal knowledge and other evidence that would be admissible at trial under the Federal Rules of Evidence.  Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002).  The evidence is viewed in the light most favorable to the non-movant and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Summary judgment is inappropriate when alternate inferences can

be drawn from the evidence, as the choice between reasonable inferences from facts is a jury function. Id.  However, conclusory allegations do not create issues of fact which forestall summary judgment.  See Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 740 (7th Cir. 2006) ("it is . . . axiomatic that a plaintiff's conclusory statements do not create an issue of fact").

## IV. ANALYSIS

In their Motion for Summary Judgment, Defendants assert that: (1) the statements complained of by Plaintiff are not stigmatizing; (2) Defendants did not publically disseminate false statements; and (3) Defendants have not permanently foreclosed Plaintiff from a profession. Defendants focus solely on the two newspaper articles.

In response, Plaintiff argues that Defendants "ignore written communication disseminated in the fall of 2006 to the parents of ISVI students, alumni of ISVI, and the office of the Illinois Governor. According to Plaintiff, those communications (1) claimed Plaintiff was unqualified to hold his position and was hired as a result of an unethical

hiring practice; (2) accused Plaintiff of intimidating staff at ISVI; (3) accused Plaintiff of filling positions at ISVI and making other decisions based upon partisan political considerations; (4) accused Plaintiff of engaging in conduct directed toward students of ISVI which caused them to be fearful and intimidated; (5) accused Plaintiff of engaging in unethical conduct, bullying, and intimidating; and (6) accused Plaintiff of spying upon staff at ISVI.   Plaintiff also points to Defendant Adams' comment to Senator Demuzio that the reasons for Plaintiff's removal "were just too bad to talk about."

Plaintiff claims all of these statements were sufficiently serious in nature so that they would foreclose the opportunity of a career educator from finding employment opportunities in the field.  According to Plaintiff, a reasonable jury could conclude that Plaintiff's removal came at the heels of information circulated about him that was both false and stigmatizing.

In their Reply, Defendants argue the communications identified by Plaintiff are not stigmatizing.  Defendants also argue Defendant failed to

present evidence that the individual Defendants uttered public, false and stigmatizing statements about Plaintiff.

A.     Genuine Issue of Fact Remains Only As to Defendant Adams

In his Amended Complaint, Plaintiff claims Defendants made and published or encouraged other to make and publish allegations of misconduct against him.  Plaintiff asserts the allegations were false. According to Plaintiff, he was not given notice and a hearing to provide him an opportunity to clear his name.

1.     <u>Parameters of the Liberty Interest</u>

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  Because an individual has no liberty interest in his reputation, "simple defamation by the government does not deprive a person of liberty within the meaning of the Due Process Clause." <u>Mihailovic v. Soldato</u>, 2004 WL 528010, *2 (N.D. Ill. 2004); <u>see</u> <u>also</u> <u>Doyle v. Camelot Care Centers, Inc.</u>, 305 F.3d 603, 617 (7th Cir. 2002). However, "a government employee's liberty interests are implicated when

in terminating an employee, the government [(1)] makes any charge against the employee that might seriously damage his or her standing or association in the community or [(2)] impose[s] on him or her a stigma or other disability that forecloses his or her freedom to take advantage of other employment opportunities.[1]" Dziewior v. City of Marengo, 715 F.Supp. 1416, 1423 (N.D. Ill. 1989); see also Munson v. Friske, 754 F.2d 683, 693 (7th Cir. 1985) (noting that a liberty interest is implicated when "the individual's good name, reputation, honor[,] or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, Communism[,] or subversive acts"). In such cases, due process requires the individual be given an opportunity to refute the charges. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972).

This liberty interest exists even for employees who have no protected property interest in their position. See Townsend v. Vallas, 256

---

[1] The "stigma or other disability" type of claim has generally been found where the government imposes a legal barrier to future employment, such as denial of admission to the bar, disqualification from all government employment, or sending adverse information to a professional licensing agency. Adams v. Walker, 492 F.2d 1003, 1009 (7th Cir. 1974). Plaintiff has presented no evidence that his claimed inability to find employment was a result of this type of stigma or disability imposed on him by Defendants.

F.3d 661, 669 n. 8 (7th Cir. 2001). In addition, the employee need not
be discharged to have a cause of action for deprivation of a liberty
interest so long as he suffers a tangible change in employment status. <u>See</u>
<u>Dziewior v. City of Marengo</u>, 715 F.Supp. 1416, 1423 (N.D. Ill. 1989);
<u>Lawson Sheriff of Tippecanoe County, Ind.</u>, 725 F.2d 1136, 1139 (7th
Cir. 1984) (demotion to a menial job can constitute a tangible change in
employment status). The parties do not appear to dispute, for purposes
of summary judgment, that Plaintiff suffered a tangible change in
employment status when he was transferred from his superintendent
position to a position with the Forensic Unit.

To prevail on a liberty cause of action, a plaintiff must show that
the following: that (1) he was stigmatized by the defendant's conduct; (2)
the stigmatizing information was publicly disclosed; and (3) he suffered a
tangible loss of other employment opportunities as a result of the public
disclosure. <u>Covell v. Menkis</u>, 595 F.3d 673, 677-78 (7th Cir. 2010); <u>see</u>
<u>also</u> <u>Nickum v. Village of Saybrook</u>, 972 F.Supp. 1160, 1168-69 (C.D.Ill.
1997) (noting a plaintiff must prove a tangible change in status, the

charges are false and stigmatic, the charges were publicly disseminated, and the plaintiff was deprived of a name-clearing hearing).

In addition, the stigmatizing information must be disclosed incident to the change in employment status. See, e.g., Siegert v. Gilley, 500 U.S. 226, 234 (1991) (noting the "alleged defamation was not uttered incident to the termination . . . .since [the plaintiff] voluntarily resigned . . . and the letter was written several weeks later"); Paul v. Davis, 424 U.S. 693, 710 (1976) ("the defamation had to occur in the course of the termination of employment").

"A liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment." Munson, 754 F.2d at 693. Moreover, mere proof that the individual is less attractive to employers is insufficient to demonstrate that other employment opportunities have been foreclosed. Id.

2.   Defendants Must Be Personally Involved to be Liable Under § 1983

In his Amended Complaint, Plaintiff alleges that Defendants

deprived him of his liberty interest. "Liability under § 1983 must be premised on personal involvement in the deprivation of the constitutional right, not vicarious liability." Payne for Hicks v. Churchich, 161 F.3d 1030, 1042 n. 15 (7th Cir. 1998); Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983) ("An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation") (emphasis in original). However, a defendant need not directly participate in the violation if (1) he "acts or fails to act with a deliberate and reckless disregard of [the] plaintiff's constitutional rights"; or (2) "the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent." Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir. 1986); see also Patterson v. Burns, 670 F.Supp.2d 837, 849 (S. D. Ind. 2009). In the context of a liberty interest claim, the Seventh Circuit has held that "only if the defendants themselves published the defamatory material can [the plaintiff] recover for deprivation of his liberty interest." McMath v. City of Gary, Indiana, 976 F.2d 1026, 1032, 1034 (7th Cir. 1992)

(noting that evidence suggesting that someone in city government revealed false and damaging information was insufficient; the plaintiff was required to link "these particular defendants" to the public statements) (Emphases in original).

Plaintiff asserts that Defendants Adams, Hou, and Kilbury were involved in the decision to remove Plaintiff as Superintendent. However, this fact alone is insufficient to establish liability for a violation of Plaintiff's liberty interest. In Morgan v. Tandy, 2001 WL 1397307, *7 (S. D. Ind. 2001), the district court rejected the argument that two of the defendants should be held responsible because they received the results of the investigation and participated in the decision to fire the plaintiff, stating:

> The problem with the argument is the narrow focus of the Fourteenth Amendment right at issue here. As far as the Fourteenth Amendment is concerned, the defendants were free to ask for an investigation of [the plaintiff], and they were free to fire him for good reasons or bad reasons. The only federal claim that survived the motion to dismiss was [the plaintiff's] claim that public disclosure of the reasons for his firing deprived him of liberty without due process of law.

Morgan, 2001 WL 1397307 at *7; see also Mihailovic, 2004 WL

528010, at *3 (finding the plaintiff's claim that he was deprived of

liberty failed to state a claim upon which relief could be granted because

he did not allege that his employer made or communicated any

defamatory statements about him incident to his termination; at most he

alleged that others made defamatory statements and that the employer

relied on those statements to terminate him).

Plaintiff also asserts that a "campaign was launched behind

[Plaintiff's] back to have him removed as ISVI's superintendent."

However, Plaintiff is still required to point to some evidence that the

individual Defendants were involved in the alleged campaign. See Quinn

v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2nd Cir.

1980) (reversing summary judgment in favor of the defendants where the

plaintiff presented evidence that the defendants created an impression

that the plaintiff was criminally responsible for the missing funds);

Patterson v. City of Utica, 370 F.3d 322, 334-35 (2nd Cir. 2004) (holding

that the "jury could have inferred that [the defendant's] statements to

the press constituted a subtle campaign to make [the plaintiff] the scapegoat for . . . [the] misfeasance"); Covell , 595 F.3d at 678 (plaintiff failed to demonstrate that any of the defendants disclosed the stigmatizing information to the public).

Therefore, this Court will first examine whether Plaintiff has sufficiently linked each Defendant to the alleged defamatory statements. If so, this Court will then examine whether genuine issues of material fact exist whether: (1) Plaintiff was stigmatized by that particular Defendants' conduct; (2) the stigmatizing information was publicly disclosed; and (3) Plaintiff suffered a tangible loss of other employment opportunity as a result of the publication.  Covell, 595 F.3d at 677-78.

### a.   Defendant Smith

Defendant Smith was Plaintiff's supervisor until approximately March 2006.  Plaintiff agrees to the dismissal of Smith from the case because discovery revealed she had little involvement in the incidents giving rise to the lawsuit.  Therefore, summary judgment will be granted in favor of Smith.

## b.    Defendant Breen

Defendant Breen was the Director of Support Services at ISVI.  In his response to the Motion for Summary Judgment, Plaintiff does not specifically identify how Breen is tied to the communications about which Plaintiff complains.  Breen did testify that she complained about Plaintiff to Defendant Olson, but statements made to employees within the department are not considered public dissemination.   <u>Covell</u>, 595 F.3d at 678 (statements made to employees within the department are not considered public dissemination); <u>see</u> <u>also</u> <u>McMath </u>, 976 F.2d at 1035 (dissemination within the chain of command does not qualify as publication).  Because Plaintiff has failed to point to any evidence suggesting Breen was personally responsible for the alleged constitutional violation, summary judgment will be granted in favor of Breen.

## c.    Defendant Hou

Defendant Hou was the Assistant Director of the Department.  In his response to the Motion for Summary Judgment, Plaintiff does not identify how Defendant Hou was linked to the alleged stigmatizing

statements.  Because Plaintiff has failed to point to any evidence that Defendant Hou was personally responsible for the alleged constitutional violation, she is also entitled to summary judgment.

### d.    Defendant Kilbury

Plaintiff alleges Kilbury was involved in disseminating stigmatizing information about Plaintiff because Kilbury "was responsible for overseeing the preparation of a briefing paper identifying the reasons for [Plaintiff's] removal, which was intended to be circulated to members of the General Assembly to brief several legislators about the reasons for his removal."

However, the record does not contain the briefing paper or any evidence that it was prepared and publicly disseminated.  Without such information, this Court cannot determine whether the information contained therein was stigmatizing.  See, e.g., Hadley v. County of DuPage, 715 F.2d 1238, 1247 (7th Cir. 1983) (finding the plaintiff failed to establish it was the defendants' actions or statements that resulted in his alleged deprivation of due process where the plaintiff failed to cite a

specific statement made by the defendants which resulted in any stigma to his reputation).

This Court notes, however, that Thomas Green, the public information officer, testified that it was "quite likely" that Kilbury was one of the individuals who told Green how to respond to the media following the removal of Plaintiff from his position.  See, e.g., Chavez v. Illinois State Police, 251 F.3d 612, 651-52 (7th Cir. 2001) (a defendant "will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge and consent").

To prove the first element of his deprivation of liberty claim, Plaintiff must show that he was stigmatized by a Defendant's conduct, which requires showing that a Defendant made defamatory statements about him.  Strasburger v. Board of Education, Hardin County Community Unit School Dist. No. 1, 143 F.3d 351, 356 (7th Cir. 1998) (the defamatory statement must be a false assertion of fact).  Defendants assert that none of the statements in the newspaper articles attributable

to Defendants are stigmatizing.  See Hadley, 715 F.2d at 1245 (noting

that statements in  newspaper articles attributable to sources other than

the defendants did not support the plaintiff's liberty claim).

A plaintiff's liberty interest is not infringed by every remark uttered

by a government official that affects his reputation.  Lipp v. Board of

Education of City of Chicago, 470 F.2d 802, 805 (7th Cir. 1972).

Termination and the announcement of a termination alone do not

infringe a liberty interest.  Trevathan v. Walker, 2008 WL 282204, *4

(S.D. Ill. 2008).  An act is stigmatizing only where it is false, defamatory,

and "accompanied by a publicly announced reason that impugns the

employee's moral character or implies dishonesty or other job-related

moral turpitude."  Id. (citations omitted).

Only statements that "'might seriously damage [one's] standing and

associations in his community'" are actionable.  Hadley, 715 F.2d at

1245, quoting Roth, 408 U.S. at 573.  Charges of incompetence, neglect

of duty, malfeasance of office, mismanagement, and failure to meet a

specific level of management are all insufficient to implicate a liberty

interest.  See Munson, 754 F.2d at 693; Ulichny v. Merton Community

School Dist., 249 F.3d 686, 705 (7th Cir. 2001).

Moreover, because defamatory statements are false assertions of

fact, statements of opinion, even if stigmatizing, do not constitute

defamatory statements so long as the statements do not imply false facts.

Strasburger, 143 F.3d at 356.  Further, "the statements must be of a kind

such that the discharged employee could refute them and clear his name,

given the opportunity."  Id.

In the first newspaper article, the only statements attributable to

Kilbury, through Green, were statements that Plaintiff would begin to

work at the Mental Health Forensics Unit and that Green did not have a

statement on why the change was made.  In the second newspaper article,

the only statements attributable to Kilbury, through Green, were

statements that Plaintiff would be moved to the Mental Health Forensic

Unit.  Green also stated he could not comment on the reasons behind the

transfer, that it was a "'management decision,'" and that "[i]t (the move)

may have appeared to be sudden, but DHS did have reasons that led up

to it, and it wasn't sudden. "

None of these statements are stigmatizing. No reason is given for Plaintiff's transfer. The statement that the decision was not sudden and that the Department had reasons for the transfer are not false and do not imply false facts. See, e.g., Strasburger, 143 F.3d at 356 (stigmatizing statements of opinion are not actionable so long as they do not imply false facts). Moreover, the statements in the newspapers attributable to Kilbury do not impugn Plaintiff's moral character, imply dishonesty, or imply other job-related moral turpitude. See, e.g., Trevathan, 2008 WL 282204, at *5 (statements that an "anonymous nurse was terminated in connection with the death of an inmate, the opinion that the anonymous nurse bore some responsibility for the death, and the implication that the anonymous nurse was negligent in his duties" were not stigmatizing). Therefore, summary judgment will be granted in favor of Defendant Kilbury.

e.    Defendant Olson

In his response to the Motion for Summary Judgment, Plaintiff

asserts a body of evidence connects "Olson to the dissemination of the information that was part of the campaign seeking [Plaintiff's] removal." Plaintiff points to (1) Olson's dislike of Plaintiff; (2) the lack of evidence that Olson's feeling toward Plaintiff was shared by anyone else; (3) the campaign to remove Plaintiff began with an attack on the adequacy of Plaintiff's credentials, Olson had access to Plaintiff's credentials, someone left Plaintiff's credentials at Dickison's home, and Olson communicated her concern regarding Plaintiff's credentials to Smith in March 2006; (4) the information being disseminated about Plaintiff was information about which Olson claimed to have knowledge; (5) the only individuals critical of Plaintiff who identified themselves did so only after talking to Olson; (6) Olson knew in advance that individuals would protest during LaHood's visit but did not tell Plaintiff; (7) the letter writing campaign contained information of the type Olson claimed to possess; (8) the "Politics" letter appeared on the chair in Olson's office and she offered no explanation how such letter would have found its way to her chair; and (9) Olson attempted to orchestrate the individuals the BCA should

interview although this was not a role she was assigned to play.

Plaintiff also points to Olson's conduct during and after the LaHood visit. Specifically, Plaintiff points to Olson's comment of "let's see you get your ass out of this one" to Plaintiff before Plaintiff was going to speak to a reporter. Plaintiff also points to evidence that Olson visited Breen in the hospital after the LaHood visit, waved the pamphlet distributed during the protest, and stated "[W]e got him, we got him ."

This Court finds that Plaintiff has not demonstrated a genuine issue of material fact remains whether Defendant Olson disclosed the alleged stigmatizing information to the public. Plaintiff engages in mere speculation and points to no evidence that Defendant Olson directed the letter-writing campaign. To hold Defendant Olson liable, Plaintiff must point to some evidence that Defendant Olson was personally involved in the letter writing campaign. See Quinn, 613 F.2d at 445 (2nd Cir. 1980) (reversing summary judgment in favor of the defendants where the plaintiff presented evidence that the defendants created an impression that the plaintiff was criminally responsible for the missing funds,

including newspaper reports that refer to statements by two of the defendants and which implied that the plaintiff was responsible for the missing funds); Patterson, 370 F.3d at 334-35 (2nd Cir. 2004) (holding that the "jury could have inferred that [the defendant's] statements to the press constituted a subtle campaign to make [the plaintiff] the scapegoat for . . . [the] misfeasance"). Plaintiff has failed to present such evidence here.

However, even if Plaintiff could raise a genuine issue of material fact whether Olson was involved in the dissemination of the anonymous correspondence, Olson is also entitled to summary judgment because (1) the correspondence was not disseminated incident to Plaintiff's removal, (2) the correspondence was not stigmatizing, and (3) Plaintiff cannot demonstrate an employment loss occurred as a result of the publication.

      i.    Correspondence Was Not Disseminated Incident to Plaintiff's Removal

To state a liberty claim, the stigmatizing information must be disclosed incident to the change in employment status. See, e.g., Siegert, 500 U.S. at 234. The March 2006 pamphlet, as well as the April 21,

2006, September 18, 2006, September 21, 2006, September 26, 2006, and October 25, 2006, letters were not disseminated incident to Plaintiff's removal from the Superintendent's position.  See Paul, 424 U.S. at 710 ("the defamation had to occur in the course of the termination of employment").  Therefore, even if Plaintiff were able to tie Olson to the correspondence, the correspondence was not disseminated incident to or in the course of Plaintiff's removal from the position.  See, e.g., Goecks v. Pedley, 732 F.Supp.2d 828, 833 (W.D. Wisc. 2010) (statements made over 18 months after the plaintiff resigned were not made incident to or in the course of the plaintiff's resignation); Emery v. Northeast Illinois Regional Commuter R.R. Corp., 2003 WL 22176077, *3 (N.D. Ill. 2003) (noting that while the publication and termination need not occur simultaneously, "statements made weeks (let alone months) before or after termination are not statements made in the context of termination"); see also Newton v. Chicago School Reform Bd. of Trustees, 1997 WL 603838, *7 (N.D. Ill. 1997) (allegation that stigmatizing information was disclosed two months before the

termination showed that occupational liberty claim must be dismissed).

    ii..    <u>The Correspondence Was Not Stigmatizing</u>

In addition, the correspondence was not stigmatizing. To prove the first element of his deprivation of liberty claim, Plaintiff must show that he was stigmatized by Defendant Olson's conduct. <u>See</u> <u>Strasburger</u>, 143 F.3d at 356. As previously stated, an act is stigmatizing only where it is false, defamatory, and "accompanied by a publicly announced reason that impugns the employee's moral character or implies dishonesty or other job-related moral turpitude." <u>Trevathan</u>, 2008 WL 282204, at *4 (citations omitted).

The correspondence in question largely criticized Plaintiff's management of ISVI. The letters complained of Plaintiff's alleged intimidation of staff, asking students to spy on each other, causing students to feel fearful and intimidated. Such criticism is not defamatory as it merely reflects a disagreement with Plaintiff's management skills. <u>Munson</u>, 754 F.2d at 693 (statements that merely reflected an evaluation of the plaintiff's professional skills as an employee were not stigmatizing);

Ulichny, 249 F.3d at 705 (statements by district administrator that he shared concerns regarding the plaintiff's "'lack of trust,'" teacher morale, the public's regard for the administration, the teacher's regard for the board, the unsettled teachers' contract, and teacher turnover did not attack the plaintiff's moral character).

The correspondence also asserted Plaintiff was not qualified for the position of Superintendent because of his lack of a superintendent's certification. The fact that Plaintiff did not have his superintendent's certification was true. See, e.g., Strasburger, 143 F.3d at 356 ("True but stigmatizing statements" do not support a deprivation of liberty claim). That this caused Plaintiff to be unqualified for the position was clearly the author's opinion. Id., at 356 (statement that "[w]e need to get rid of that SOB [plaintiff] before he hurts one of those girls" was not a false assertion of fact but a statement of opinion that does not imply a falsehood).

Some of the correspondence complained that Plaintiff filled positions with friends or based on political affiliation and that Plaintiff

was "unethical."  Such statements are not sufficiently stigmatizing to establish a liberty claim.  See Pleva v. Norquist, 195 F.3d 905, 916 (7th Cir. 1999) (accusation of "cronyism" on the part of an individual in a policymaking position was not stigmatizing); Jeffries v. Turkey Run Consol. Sch. Dist., 492 F.2d 1, 2-3 n.1 (7th Cir. 1974) (finding that a charge of "highly unethical conduct" was not sufficiently stigmatizing).

For all these reasons, this Court finds no genuine issue of material fact remains whether the statements in the correspondence was stigmatizing.

iii.    Plaintiff Cannot Demonstrate an Employment Loss as a Result of the Publication

Even if Plaintiff could tie Defendant Olson to the correspondence, the correspondence was disseminated in the course of Plaintiff's transfer, and the correspondence was stigmatizing, Plaintiff must still demonstrate that he experienced a tangible loss of other employment opportunities as a result of the publication.  See Munson, 754 F.2d at 694.

In his affidavit, Plaintiff stated that he contacted his network of friends in the public education sector.  Plaintiff admitted he told them he

had been removed from his position as superintendent at ISVI and that "[e]ach of them was aware of that occurrence."  The mere fact that the individuals were aware that Plaintiff had been removed from his position as superintendent is insufficient.  A dismissal alone does not implicate a protected liberty interest.  <u>Doe v. Board of Trustees of University of Illinois</u>, 429 F.Supp.2d 930, 942-43 (N.D. Ill. 2006).

Plaintiff fails to point to any evidence that he was denied an employment opportunity because of the information in the correspondence disseminated in 2006.  Plaintiff testified some of the individuals with whom he spoke about job opportunities were aware of the newspaper articles.  As noted above, the newspaper articles were not stigmatizing.

Plaintiff also testified he showed one individual "[his] allegations." It is not clear what "allegations" Plaintiff showed someone.  However, if that is the reason Plaintiff was denied a future job opportunity, then it would appear that Plaintiff did not lose an employment opportunity as a result of Defendants' public disclosure of information.  <u>See</u> <u>Morgan</u>,

2001 WL 1397307, at *10 (noting the plaintiff failed to produce specific evidence that other employment opportunities were lost because of the defendant's statements and presented no evidence that the statement caused any harm to the plaintiff's future career); <u>Francis v. City of Crystal Lake</u>, 1998 WL 744054, *5 (N.D. Ill. 1998) (granting summary judgment in part on the basis that none of the individuals who failed to hire the plaintiffs said the decision was based on rumors or statements they heard about either of the plaintiffs).

Plaintiff also notes that Defendant Kilbury testified that he would not hire a superintendent who allegedly threatened and intimidated students, threatened staff, or made decisions based on partisan politics. However, mere proof that the individual is less attractive to employers is insufficient to demonstrate that other employment opportunities have been foreclosed. <u>Munson</u>, 754 F.2d at 693.

### f.    Defendant Adams

Plaintiff asserts he has presented sufficient evidence that Defendant Adams publicly disseminated false statements concerning Plaintiff to

warrant a trial.  Plaintiff states that "[w]hile Adams may not have circulated particular pieces of stigmatizing information," her statement to Senator Demuzio–labeling Plaintiff's conduct as "too bad to talk about"–"painted a picture which was highly unflattering of [Plaintiff] and created a reasonable inference that he engaged in serious misconduct."

Defendants do not specifically address this statement either in their Motion or the Reply.  Defendants did admit, in response to Plaintiff's Additional Statements of Undisputed Fact, that Adams made the statement but assert that the statement is immaterial because the statement was not stigmatizing.

This Court disagrees.  A reasonable jury could find that Defendant Adams' statement to Senator Demuzio created a false and defamatory impression about Plaintiff.  See, e.g., Codd v. Velger, 429 U.S. 624, 628 (1977) (name-clearing hearing only required where "the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination"); Quinn, 613 F.2d at 447 (statement need not be explicit; "a carefully conceived scheme of suggestion and

innuendo may be all the more devastating to individual liberty because it is more difficult to refute").

As for the second element of the claim–whether the information was publicly disclosed in the course of Plaintiff's removal from the position– disclosure to one person can constitute publication, particularly where the person to whom the information is disclosed is under no legal obligation to keep the information private.  See Morgan, 2001 WL 1397307, at *8 (disclosure to one person who has no legal obligation to keep the information private constituted publication).  Because it is unclear when Senator Demuzio spoke to Defendant Adams–her affidavit identifies November or December– a question of fact also remains whether the disclosure was made in the course of Plaintiff's removal.  See Paul , 424 U.S. at 710 ("the defamation had to occur in the course of the termination of employment"); see also Hadley, 715 F.2d at 1247 (statement made nearly two years after the plaintiff's termination did not give rise to a liberty interest).

Finally, Plaintiff has also demonstrated a genuine issue of material

fact exists whether Plaintiff suffered a tangible loss of other employment opportunities as a result of the disclosure. See Townsend v. Vallas, 256 F.3d 661, 670 (a plaintiff must show he was stigmatized, the stigmatizing information was publicly disclosed, and that he suffered a tangible loss of other employment opportunities as a result of the public disclosure).

In his affidavit, Plaintiff stated he contacted Senator Demuzio about employment in an educational capacity in state government. Plaintiff also asserted each of the individuals he contacted about employment– which presumably includes Senator Demuzio–indicated Plaintiff should "clear up the situation at ISVI before" he applied for a position. At the very least, Plaintiff has demonstrated an issue of fact exists whether he suffered a tangible loss of other employment opportunities as a result of Defendant Adams' disclosure of information to Senator Demuzio. Therefore, Defendant Adams is not entitled to summary judgment.

B.    Proper Remedy for a Deprivation of a Liberty Interest is a Name-Clearing Hearing or, in Some Instances, Compensatory or Nominal Damages

Defendants argue that Plaintiff's claim against them in their official capacity for reinstatement is injunctive relief and is barred by the Eleventh Amendment. <u>Ex Parte Young</u>, 209 U.S. 123, 159-60 (1908); <u>Sonnleitner v. York</u>, 304 F.3d 704, 717 (7th Cir. 2002). In his response to the Motion, Plaintiff agrees he is not entitled to equitable relief in the form of reinstatement.

Defendants also assert that Plaintiff is not entitled to money damages. According to Defendants, the only relief recoverable in a due process claim for deprivation of a liberty in an occupation is a name-clearing hearing.

While a name-clearing hearing is the appropriate remedy for a deprivation of a liberty interest, the hearing can in some instances be inadequate. <u>See</u>, <u>e.g.</u>, <u>Patterson</u>, 370 F.3d at 337-38 (finding the hearing provided was insufficient and refusing to remand for a proper name-clear hearing where it would come too late to "reverse any ill effects"). In such case, compensatory damages may be appropriate. <u>Id.</u> (finding a plaintiff may be entitled to damages caused by the failure to provide him with a

name-clearing hearing); see also Ratliff v. City of Milwaukee, 795 F.2d

612, 627 n. 4 (7th Cir. 1986) (a plaintiff may be entitled to nominal

damages for a deprivation of her liberty interest if she cannot

demonstrate actual damages arising from the denial of a timely name-

clearing hearing).  Therefore, Plaintiff's claim for compensatory damages

against Defendant Adams remains.

## VII.  CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment

(d/e 29) is GRANTED IN PART and DENIED IN PART.  Summary

judgment is granted in favor of Defendants Hou, Kilbury, Smith, Olson,

and Breen.  Defendants Hou, Kilbury, Smith, Olson, and Breen are

dismissed from the case.  Summary judgment is denied as to Defendant

Adams.

This case remains set for final pretrial conference on October 17,

2011 at 10:00 a.m.  The parties are advised to read the General Rules for

Conduct of Counsel in the Courtroom and During Trial in Proceedings

before U.S. District Judge Sue Myerscough, available at the Court's

website: www.ilcd.uscourts.gov

ENTER: September 1, 2011

FOR THE COURT:

<u>          s/Sue E. Myerscough          </u>
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE